UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CURTIS L. HOLT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:04-CV-402 PS |
| | ) | |
| FORD MOTOR CREDIT COMPANY, | ) | |
| A Delaware Corporation, and PAUL | ) | |
| HEURING FORD, INC., an Indiana | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After Curtis Holt's lease of a 1999 Ford Expedition expired in 2002, he entered an installment contract with the dealership of Paul Heuring Ford to buy the vehicle. Heuring then assigned the contract to Ford Motor Credit Company ("FMCC"). Over the next two years, Holt was chronically late with his payments. At first, FMCC apparently took no action, but when Holt fell behind on his payments in the spring and summer of 2004, FMCC began collection efforts. After failing to reach him over a period of several weeks, FMCC authorized Bulldog Towing and Recovery to repossess the vehicle. Bulldog took the Expedition on July 19, 2004. This spurred Holt into action. He began contacting FMCC and disputing his payment history. Unable to resolve his dispute directly, he filed this lawsuit three months later. In addition to claiming that his truck was wrongfully repossessed, Holt claimed, among other things, that the purchase contract violated various federal statutes, that Heuring committed fraud by misrepresenting the terms of the purchase agreement, and that his signature on the purchase contract had been forged.

Defendants have moved for summary judgment. In response, Holt offers only his

inherently contradictory deposition testimony and affidavit.  Because no reasonable jury could find for Holt on any of his claims, summary judgment is granted.

## I. BACKGROUND

### A. Purchase of the Expedition

On or about January 23, 1999, Curtis Holt entered a three-year lease of a 1999 Ford Expedition from Paul Heuring Ford.  [DE 77-5.]  Under the lease agreement, Holt paid $668.47 per month.  [*Id*. at 1.]  The lease agreement provided an option for Holt to purchase the vehicle at the end of the lease for $24,479.10.  [*Id*.]  When the lease expired in January 2002, Holt asked for, and received, a six-month extension on the lease.  [DE 77-34 at 2.]  In August 2002, after the extension had expired, Holt brought the car back to the dealership.

Holt says that he talked with a Heuring employee named "Andrew," who told him that he could save a lot of money by buying the vehicle rather than leasing another vehicle.  [DE 77-34 at 2.]  "Andrew" told him that his monthly payments would be in the range of $400 or $450, a substantial decrease from his monthly payments on the Expedition lease.  [*Id*.]  This information was never communicated in writing.  [*Id*. at 3.]

Holt admits that, at some point after this conversation, he entered an agreement to purchase the vehicle.  [*Id*.]  He says, though, that "Andrew" "was going to take care of whatever the paperwork that was required," and Holt drove the vehicle home.  [*Id*.]  He testified:

> I did not sign a – I did not sign a contract, as I don't believe I signed a contract.  The only thing I signed was a form, and I do specifically recall the salesperson saying, oh, I just need this in order to get information back from Ford Credit . . . and it was just like a worksheet, and he said that he needed me to sign that so that he would have authority to get information from Ford Motor Credit.  And that was basically the only thing that I signed.

[*Id*. at 4.]  He testified at deposition that "somewhere along the line [ ] Paul Heuring Ford

2

submitted documentation that I had signed a complete contract and that I had done all these other things that would formalize that sale of that vehicle at that stated price, and that is something that I don't believe that I did." [*Id.*]  Heuring produced a contract for the purchase of the car with Holt's signature on it, but Holt claims it is a forgery.  (Compl. ¶ 15.)  Although Holt says he does "not believe (he) signed a contract" he contradicted himself by saying that he was under the impression that he had "purchased the vehicle from Ford Motor Credit, under a 24-month contract."  (DE 84-2 at 4; *see also* Compl. ¶ 12 (Plaintiff alleges that the contract was a thirty-six month contract).)

According to Holt, Heuring made a mistake in charging him a purchase price that was higher than the purchase option in the lease.  [DE 77-34 at 4.]  This resulted in monthly payments that were about $200 per month higher than what he says he agreed to pay.  Plaintiff says he complained after learning that the purchase contract would require him to pay more than $640 per month. (Compl. ¶ 12.)  He also testified that he was told by FMCC that Heuring admitted it had made a mistake, but the mistake was never corrected.  [DE 77-34 at 4.]

Heuring's finance manager, Cheryl Salatas, was present when Holt came to Heuring on August 13, 2002 to negotiate the purchase of the Expedition.  [DE 77-35 at 2.]  She testified that she watched Holt sign the Indiana Simple Interest Vehicle and Retail Instalment Contract (RIC) for the purchase of the vehicle, along with all other documents associated with the purchase. [*Id.*]  She also stated that all of the disclosures within the contract were made before credit was extended to Holt.[1]  [*Id.*]

---

[1] For his part, Holt averred that he does not know who Cheryl Salatas is, and never signed any papers in the presence of such a person.  [DE 91 ¶¶ 2-3.]

3

The RIC produced by Defendants states that the cash price of the car is $23,362.63. [DE 82-2 at 2.] The contract reflects that Holt paid a down payment of $600, so he had an unpaid balance of $22,762.63. [*Id.*] Adding in taxes of $1,168.13, the RIC reflects that the total amount financed was $23,930.76. [*Id.*] The RIC discloses an annual interest rate of 21%, which, over the five-year life of the loan, results in a total financing charge of $14,896.44. [*Id.*] Under the contract, Holt was to make 60 monthly payments of $647.12. [*Id.*] Under the RIC, payments were due on the 12th of every month, starting September 12, 2002. [*Id.*] Holt averred that he "would have never agreed to a 60 month contract of $647.12 for a used vehicle." [DE 91 at 2.]

Heuring retained a handwriting analyst, Clarke Mercer, for the purpose of determining the authenticity of the signatures on the RIC and other documents that Holt maintains he did not sign. Mercer has training in forensic document examination, and he worked as a forensic document analyst for the United States Postal Inspection Service before opening his own private practice in forensic document examination. [DE 77-33.] He has testified in several dozen cases. [DE 77-31.] Mercer compared the signatures on the RIC, the lease agreement, and other documents produced by Defendants with Holt's signatures on litigation documents and his driver's license. [DE 77-3 at 1.] In Mercer's opinion, all of the signatures were made by Holt. [*Id.* at 2.]

**B. Repossession**

Holt also claims that the Expedition was wrongfully repossessed in July 2004. This claim is somewhat at odds with his claim that his signature was forged on the RIC. Thus, although Holt says that Heuring forged his signature on a contract whose terms he did not agree to, he continued to make payments on the vehicle consistent with that contract for nearly two

4

years. [DE 82-4 at 4-7.] Holt acknowledges that those payments were not always timely. [*Id*. at 4-5; DE 77-34 at 5.] At his deposition, he testified, "It was my practice never to fall more than 30 days behind because I believed that at the two-month mark . . . they start initiating collection actions so I tried to never be more than 30 days behind." [DE 77-34 at 5.] But he alleges that he was not in default at the time his truck was repossessed.

Under the RIC, the buyer "will be in default if [ ] you do not make a payment when it is due . . . ." [DE 82-2 at 4.] The RIC states that in the event of default, FMCC could repossess the vehicle or demand payment of the entire loan principal. [*Id*.] It also states that "[a]cceptance of a late payment does not excuse your default or mean that you can keep making payments after they are due. The Creditor may take the steps set forth if there is any default." [*Id*.]

Neither Holt nor FMCC produced Holt's payment records. But at deposition, Holt did not dispute that he was anywhere from two days to several weeks late on every payment from February 2003 until the spring of 2004. [DE 82-4 at 6-7.] FMCC's collection records show that, at the time it repossessed the vehicle, it did not have a record of any payments made by Holt in April or May 2004. [DE 82-3 at 5.] At his deposition, Holt did not dispute FMCC's assertion that he made his April 2004 payment on June 7, 2004, or that he made his May 2004 payment on July 8, 2004. [*Id*. at 7.] Yet Holt testified that he was current with his payments on the date the car was towed.[2]  [DE 82-4 at 7.] Although Holt testified that MoneyGram, the payment service

---

[2] In fact, records produced by FMCC indicate that Holt had actually made a payment in May that had not been credited to his account. [DE 82-3 at 5.] Holt has not raised this fact in his summary judgment briefing. However, as the Court understands the evidence, even if the May payment had been credited properly, it would have been applied to the payment that was due on April 12, and the payments Holt made on June 7 and July 8 would have applied to the balance due on May 12 and June 12, respectively. Therefore, even if the payment had been credited properly, Holt was still in default on the July payment when the truck was repossessed.

5

he used to make payments on the Expedition, would have records of his payment history, he testified that he had not attempted to acquire those records. [*Id*.]

FMCC produced records of its collections department's efforts to contact Holt in June and early July 2004. [DE 82-3 at 5-7.] During this period, FMCC's collections personnel tried to reach Holt at home and work, and they also called a relative and some neighbors. [*Id*.] Dion Garza, a Team Lead in the Loss Prevention Department, averred that FMCC determined to repossess the Expedition on July 15, 2004 because he was delinquent in his payments. [DE 82-3 at 3.] FMCC had also become aware that the State of Indiana had a second lien on the vehicle in the amount of $3,689.00. [*Id*. at 3, 7.] FMCC authorized one of its contractors, Bulldog Towing and Recovery, to repossess the car. [*Id*. at 5.] Bulldog took the car away on July 19, 2004. [*Id.*]

**C. Procedural Background**

Plaintiff filed his complaint in this case on September 29, 2004. [DE 1.] Discovery proceeded over the better part of two years, finally wrapping up in August 2006. Plaintiff has evidently taken no discovery in this case. At his February 17, 2006 deposition, he testified that he had not conducted any discovery because he had a health problem that prevented him from doing so, and prevented him from having the resources to hire a lawyer to do so. [DE 77-34 at 4.] In response to interrogatories, Holt could not identify any witnesses who had information relevant to the lawsuit, and stated that he had not retained any experts. [DE 77-36 at 2.] Holt testified that he did not have a copy of the lease agreement and did not sign anything with respect to the purchase of the vehicle except a "worksheet" to authorize Heuring to get

information from FMCC.  [DE 77-34 at 4.]  He also testified that he had no documentation of his payments, and had not asked his third-party payment service for any records.  [*Id*. at 8.]  He stated that any of the documentation that he saved related to payments would have been in his truck when it was repossessed, but he did not recall those documents being there when he claimed his personal possessions from the towing company.  [*Id*. at 8.]

## II. DISCUSSION

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir. 2004).  The court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).  In undertaking this analysis, I am mindful that *pro se* pleadings are "to be liberally construed." *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (citation and quotation omitted); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

### A. Claims Relating to the Sale of the Expedition

#### 1. Truth In Lending Act

Count I of the complaint alleges that Defendants failed to disclose the "cash price" of the Expedition, the annual percentage rate, and the amount financed, in violation of the Truth In Lending Act (TILA), 15 U.S.C. § 1600 et seq.  (Compl. ¶¶ 37-39.)  Under TILA, creditors are required to make certain disclosures before extending credit to customers.  12 C.F.R. §

7

226.17(b).  These disclosures must be made "clearly and conspicuously in writing, in a form that the consumer may keep."  12 C.F.R. § 226.17(a)(1).  Defendants argue that they complied with TILA, and that the claim is barred by the one-year statute of limitations, 15 U.S.C. § 1640(e).

Setting aside the statute of limitations issue, Holt fails to raise a genuine issue of fact with respect to Defendants' compliance with TILA.  He does not cite to any evidence supporting his claim that Defendants did not include appropriate disclosures.  Defendants offer the Indiana Simple Interest Vehicle Retail Installment Contract (RIC) that they claim Holt entered into to purchase the Expedition.  [DE 77-14; DE 82-2.]  This contract contains, under the heading "Federal Truth In Lending Disclosures," the annual percentage rate, the amount financed, the payment schedule of 59 payments and other information.  [DE 77-14 at 1.]  In addition, Defendants offer the affidavit of Cheryl Ann Salatas, who avers that she saw Holt sign the RIC and all other documents associated with the purchase of the vehicle.  She also states that the disclosures in the contract were all identified before credit was offered.

Holt's position, however, is that he "does not believe" that he signed the RIC.  He alleges that Heuring employees "forged plaintiff's signature on the title paper and the alleged agreement for this purchase for several thousand dollars more than the lease end price and at an unconscionable interest rate." (Complt. ¶ 15.)  He maintains that he was not at Paul Heuring Ford on August 13, 2002, and that he "would have never agreed to a 60 month contract of $647.12 for a used vehicle."  [DE 84-2 at 3.]  Rather, he states that he "believed that [he] purchased the vehicle from Ford Motor Credit, under a 24-month contract."  [*Id*. at 4.]

Even if I were to assume that Holt's signature had been forged on the RIC produced by Defendants, Holt's TILA claim would still fail.  Holt's position isn't entirely clear, but he

8

evidently asserts that he entered an oral contract with someone from Paul Heuring, and when Heuring or FMCC later memorialized the contract in writing, they either falsified the terms of the contract or recorded them inaccurately.  But if the RIC were forged, it would be a nullity – and  therefore, because it would create no obligation on Holt, the requirements of the Truth in Lending Act would not apply.  *Jensen v. Ray Kim Ford, Inc.*, 920 F.2d 3, 4 (7th Cir. 1990). Instead, any TILA claim would have to be based on the existence of an oral contract.  But Holt's hazy recollection of his conversation with the Heuring employee is too vague to constitute evidence that the parties entered into an oral contract – let alone that Heuring failed to make the disclosures required by TILA.

Nonetheless, because Holt's allegation of forgery bears on some of his other claims, it makes sense to evaluate that allegation here.  Defendants have met their burden of showing an absence of a genuine issue of fact regarding the authenticity of Holt's signature.  Heuring's handwriting expert opined that the signatures on the RIC and the other purchase and lease documents all belonged to Holt.  [DE 77-3 at 2.]  The Court has also compared the signatures on the RIC with the exemplars of Holt's signature in the record [*see* DE 77-8, 77-27], and finds that they are similar.  Further undermining Holt's assertion that he never would have agreed to pay $647.12 a month for the truck is his admission that he in fact made payments in that very amount for over a year and a half.  [DE 82-4 at 4-7.]  Although Plaintiff argues on summary judgment that he only "made payments at the leased rate to show good faith" while attempting to get the "error" in his monthly payment rate corrected, he has not demonstrated that he ever disputed the payment schedule until after the truck was repossessed.  Thus, the only evidence supporting Holt's allegation of forgery is his own assertion that he does not "believe he signed the contract."

The Court cannot reject that evidence out of hand, however, because the Seventh Circuit has firmly stated that self-serving testimony may, in some cases, be enough to withstand summary judgment. *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). But such testimony still has to meet "the usual requirements for evidence presented on summary judgment – including the requirements that it be *based on personal knowledge and that it set forth specific facts* showing that there is a genuine issue for trial . . . ." *Id*. (emphasis added). "Although testimony alone can defeat summary judgment motions in some cases, asserting a conclusion is no substitute for detail where detail is needed to support a claim." *United States v. Global Distributors, Inc.*, 2007 WL 2332502, at *4 (7th Cir. Aug. 17, 2007) (citing *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). Thus, a self-serving affidavit that merely repeats allegations without any reference to evidence "is not the kind of statement on personal knowledge that may be properly considered in an affidavit. Instead, it is just a self-serving conclusion that is insufficient by itself to defeat a motion for summary judgment." *Witte v. Wisconsin Dept. of Corrections*, 434 F.3d 1031, 1037 (7th Cir. 2006).

Mindful of the Seventh Circuit's admonitions against making credibility judgments at the summary judgment stage, the Court has evaluated Holt's affidavit and deposition testimony carefully with respect to the issue of forgery. I conclude that Holt's affidavit and deposition testimony are not sufficient to survive summary judgment because they are internally contradictory, lacking in personal knowledge, and unsupported by any record evidence. For instance, Holt concedes that he entered a contract for the purchase of the Expedition [DE 84-2 at 4], although he evidently believes that the contract was oral. But he plainly does not know what the terms of the contract were. In his affidavit, he stated that he thought it was a 24-month

10

contract; in the complaint, he references a 36-month contract. [*Id*. at 4; Compl. ¶ 12]  He attempts to prove that he did not sign a 60-month contract by averring that he "would have never agreed to a 60 month contract of $647.12 for a used vehicle." [DE 91 at 2.]

Holt also testified, "[I]t was my understanding that there was a preestablished price [for] which I could purchase the vehicle . . . at the end of the lease period.  And . . . I believe that when I decided to purchase the vehicle, that I was purchasing it at that preestablished price." [DE 77-34 at 3.]  When asked what the predetermined price was, Holt answered, "*I don't recall specifically*, but it was in the neighborhood of . . . $20,000 plus I think they called it a cap reduction or cap whatever." [*Id.* (emphasis added).]  And when asked what the Heuring employee told him his monthly payments would be, he answered, "He gave me a figure.  It was – I don't recall specifically, but I believe it was in the neighborhood between $400 and $450.  He gave me a figure."  Taken together, these statements reflect a lack of personal knowledge regarding the terms of the oral contract he allegedly entered.

Holt's position that the RIC is a forgery is undermined by his admission that he did sign *something* – he just doesn't remember what:

> I did not sign a – I did not sign a contract, as I don't believe I signed a contract.  The only thing I signed was a form, and I do specifically recall the salesperson saying, oh, I just need this in order to get information back from Ford Credit . . . and it was just like a worksheet, and he said that he needed me to sign that so that he would have authority to get information from Ford Motor Credit.  And that was basically the only thing that I signed.
>
> And I believe that somewhere along the line that Paul Heuring Ford submitted documentation that I had signed a complete contract and that I had done all these other things that would formalize that sale of that vehicle at that stated price, and that is something that I don't believe that I did."

[DE 77-34 at 4.]  In order to testify on a matter, evidence must be "introduced sufficient to

11

support a finding that the witness has personal knowledge of the matter." Fed.R. Evid. 602. Holt's testimony on whether he signed a contract is so equivocal – stating that he doesn't "believe" he signed a contract and that the form was "basically the only thing" he signed – that it raises doubt about his recollection of the transaction to such an extent that it can be fairly stated that he does not have personal knowledge of the matter.

Finally, Holt's testimony regarding the authenticity of his signatures contains inconsistencies and uncertainty. Counsel for Defendants showed him a series of documents related to the lease and purchase contract, and he repeatedly stated that the signatures on the documents were not his own. For example, he denied that the signature on the 1999 lease agreement was his own, even though he acknowledged that he signed a lease agreement in January 1999 and admitted that he was not making any claims related to the lease of the vehicle. [*Id*. at 6.] Asked whether a document entitled "Title and Document Receipt" bore his signature, he testified, "I don't recall signing my last name like that, and there's no date on this so I don't know. . . . I can't say." [DE 77-34 at 6.]

Several times, Holt stated that the signatures did not appear to be his own because they did not contain his middle initial, L. [*Id*.] Yet he later admitted the authenticity of a signature on a January 1999 Vehicle Condition Report that did not include his middle initial. [*Id*. at 7.] Holt also testified that while one of the signatures on the Vehicle Condition Report was his, he did not recognize his signature on the Odometer Disclosure Statement on the very same page. [*Id*.; DE 77-13 at 1.]

Holt then testified that neither of the two signatures on the RIC were his. The following exchange ensued:

12

> Q. Are you claiming that both of the signatures on Defendant's Exhibit 10 are not your signature where it says Curtis L. Holt?
>
> A. In looking at this, this appears to be a carbon. That doesn't appear to be an original signature.
>
> Q. Sir, whether it's a carbon or not, is that your signature at the bottom?
>
> A. It's not my signature.
>
> Q. When you've been describing these other documents where you've been saying that they are not your signature, is that because you feel that's not the way you sign your name, or is it because it wasn't an original or it was a carbon of some sort?
>
> A. That's because the way I sign my name and usually I use Curtis L. Holt. There may have been an occasion where I didn't use Curtis L. Holt, but usually I use Curtis L. Holt.
>
> Q. On Defendant's Exhibit 10, it says Curtis L. Holt on both areas of the bottom of the page, doesn't it?
>
> A. It says – it does say Curtis L. Holt on both parts, but the two signatures are not identical.

[DE 77-84 at 7.] Holt's equivocation with respect to his signatures demonstrates a lack of memory of the events in question. In sum, his testimony is so unmoored from the rest of the record that it alone cannot create an issue of fact.

The Seventh Circuit's holding in *United States v. Torres*, 142 F.3d 962, 968 (7th Cir. 1998) supports this conclusion. In *Torres*, the Seventh Circuit reviewed a grant of summary judgment in favor of the Small Business Administration against the defendant mortgagors, a married couple. The defendants argued that summary judgment was inappropriate because the record contained Mr. Torres's accusations that his signature on the mortgage was a forgery. *Id.* at 968. However, as in this case, the allegations of forgery were contradicted by a forensic document expert and the SBA employee who witnessed and notarized Torres's signature on the document. The district court had also compared the signatures and found them to be similar.

The Seventh Circuit agreed that there was no genuine issue of material fact as to the authenticity of Mr. Torres's signature. Noting that defendants had repeatedly contradicted themselves in the process of coming up with new defenses, the Court held that the Torreses could not "create genuine issues of material fact through the vehicle of shifting defense theories." *Id*. at 968. As in *Torres*, Holt's theories are contradictory and lack support in the record, and therefore, Holt's self-serving testimony is not sufficient to withstand summary judgment.

### 2. Equal Credit Opportunity Act

In Count II, Plaintiff claims that Heuring violated the Equal Credit Opportunity Act by failing to take action on his credit application within 15 days, falsifying the initial credit approval, and "fail[ing] to maintain proper records of credit actions in violation of the ECOA." (Compl.¶¶ 50-52.) For purposes of reviewing this claim, the Court assumes without deciding that Paul Heuring Ford is a "creditor" under the ECOA. *See Treadway v. Gateway Chevrolet Oldsmobile, Inc*., 362 F.3d 971, 978 (7th Cir. 2004) (dealership was a "creditor" under 15 U.S.C. § 1691a(e) because it "regularly arranges credit for its customers"). Holt does not allege that FMCC violated the ECOA.

Plaintiff has not supported this claim with any evidence, nor has he explained how they violate specific portions of the Equal Credit Opportunity Act. The ECOA makes it unlawful for any creditor to discriminate against any applicant on the basis of certain protected classes. 15 U.S.C. § 1691(a). But Holt has never alleged discrimination. The ECOA also requires that a creditor notify a credit applicant of its action on his application within 30 days of receiving the application. 15 U.S.C. § 1691(d)(1). But only when the creditor takes an "adverse action" against an applicant (*i.e.* denies credit) is the applicant entitled to notification in writing. 15

14

U.S.C. § 1691(d)(2).  In this case, no adverse action was taken.  Moreover, notice of the credit approval is implicit in the RIC, which sets forth the credit terms being offered to Holt, and which states, "By signing this contract, you choose to buy the vehicle on credit" under the terms of the contract.  [DE 77-14.]  Holt has failed to show a genuine issue of fact on this claim.

### 3.  Other Federal Claims

Plaintiff's other federal claims also fail as a matter of law.  Heuring is entitled to summary judgment on Plaintiff's Federal Consumer Leasing Act claim because, as Heuring points out, Holt admitted at his deposition that he is not making any claims with respect to the leasing of the Expedition.  [DE 77-34 at 6.]  To the extent that Plaintiff intended to state a Fair Credit Reporting Act claim, *see* 15 U.S.C. § 1681s-2, that claim fails, among other reasons, because Plaintiff has introduced no evidence that Defendants provided false information to any consumer reporting agency or otherwise violated the Act.

### 4. Fraud

Holt claims that Heuring committed fraud by falsely representing that he could purchase the Expedition for $450 per month (Count IX).  He alleges that he "reasonably relied on defendant's representation which was material to plaintiff's purchase of the vehicle."  (Compl. ¶ 82.)  He says that Heuring "knew that the unconscionable contract was not communicated to the plaintiff[,] who relied on the defendant's misrepresentations."  (*Id*. ¶ 84.)  The Court's initial observation is that Holt's fraud claim does not hinge on his allegation that Defendants' forged his signature on the RIC, but instead asserts that he was fraudulently induced to enter a contract that was fundamentally unfair.

Holt's fraud claim fails as a matter of law.  The elements of actual fraud are:  1) a

15

material misrepresentation of a past or existing fact that; 2) was false; 3) was made with knowledge or reckless ignorance of its falsity; 4) was relied upon by the plaintiff; and 5) proximately caused the plaintiff's injury. *Youngblood v. Jefferson County Div. of Family and Children*, 838 N.E.2d 1164, 1169-70 (Ind. Ct. App. 2005). To make a constructive fraud claim, a plaintiff must show that the defendant owed him a duty due to their relationship, but breached that duty by making a deceptive material representation of fact that the plaintiff relies on to his detriment, giving an unconscionable advantage to the defendant. *Wright v. Pennamped*, 657 N.E.2d 1223, 1232-33 (Ind. Ct. App. 1995).

The only evidence of any misrepresentation is Holt's testimony that a Heuring employee named "Andrew" told him he could reduce his monthly payments by purchasing the used Expedition rather than leasing a new vehicle. Since Holt never conducted any discovery in this case, the record is devoid of any evidence that would indicate who "Andrew" was, what was the context of his statement, or whether the statement was made with knowledge or reckless ignorance of its falsity. For all we know, this statement was one of opinion or mere puffery made before the Heuring employee had the opportunity to run the numbers. More fundamentally, even if a misrepresentation was made, the contract itself demonstrates that Holt received full disclosure of what his monthly payments would be before signing the contract. Therefore, no reasonable jury could conclude that Holt was fraudulently induced to enter the contract.

Holt also asserts a claim under the Indiana Uniform Consumer Credit Code (Count V) that is difficult to decipher:

> [Defendants] committed unfair, deceptive and unconscionable acts and practices in violation of the Indiana Uniform Credit Code and other state and federal laws which

16

>conduct includes, but is not limited to, representing that a consumer transaction involves or does not involve rights, remedies or obligations if the representation is false; damaging a consumer's credit reputation, stalling and evading legal obligations; failing to comply with the Truth in Lending Act; failure to comply with the Indiana Odometer Rollback Act; selling a vehicle before becoming the record owner of it; raising the price of the vehicle; failing to disclose the negative equity of the vehicle; failing to integrate all agreements in document form and deliver copies to the consumer; [and] failure to deliver title to the consumer.

(Compl. at 10-11.) Even assuming that these various alleged acts would violate the Indiana Uniform Credit Code, Holt has not produced any evidence that would support any of these allegations.

**B. Claims Related to Repossession and Debt Collection**

**1. Wrongful Repossession Claims**

Holt also asserts claims of conversion and violations of the Indiana UCC for FMCC's allegedly wrongful repossession of the Expedition (Counts III, IV, VI, VII).[3] Plaintiff's claims for violations of the Indiana UCC cannot survive summary judgment because Plaintiff has completely failed to show how any of FMCC's actions violated the UCC. Further, Plaintiff's claim for conversion fails because Holt cannot demonstrate that FMCC wrongfully repossessed the Expedition.

The RIC provides:

>You will be in default if: 1. You do not make a payment when it is due . . . . If you are in default, the Creditor may require you to pay at once the unpaid Amount Financed, the earned and unpaid part of the Finance Charge and all other amounts due under this contract. He may repossess (take back) the vehicle, too.

---

[3] Plaintiff's repossession claims apply exclusively to FMCC, not Paul Heuring Ford. Originally, Plaintiff also sued Bulldog Towing and Recovery, the towing company who recovered the vehicle from Plaintiff's property, but he stipulated to dismissal of his claims against Bulldog. [DE 83.]

[DE 82-2 at 4.]  It also states that "[a]cceptance of a late payment does not excuse your default or mean that you can keep making payments after they are due.  The Creditor may take the steps set forth if there is any default."  [*Id.*]

Plaintiff argues that he was not in default at the time of the repossession.  But he offers no evidence to prove otherwise.  In his response, Holt argues that FMCC "provides no evidence that the Plaintiff was delinquent on any payments and fails to produce accounting records of payments that it keeps in the normal course of business because they would show that Plaintiff was not delinquent and in default."  [DE 85 at ¶ 1.]  Although his criticism of FMCC's failure to produce accounting records is valid, he misunderstands the respective burdens on the parties.  As the moving party, FMCC needs only to "demonstrate the absence of a genuine issue of material fact" – it need not "support its motion with affidavits or similar materials *negating* the opponent's claim."  *Celotex*, 477 U.S. at 323.  When the moving party supports its motion for summary judgment with evidentiary materials, the burden then shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.  *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Here, FMCC has demonstrated the absence of a genuine dispute about whether Holt was in default at the time the Expedition was repossessed.  Even assuming that Holt made a payment in May 2004 that was not properly processed (an issue that Holt himself does not raise), the evidence still shows that he would have been a month behind on payments, and therefore remained in default.  Holt is unable to counter with any evidence other than his self-serving testimony that he remembers making the payments on time.  No reasonable jury could find for Holt on the basis of this testimony given his inability to recall information about any specific

18

payments, his admission that he was chronically late with his payments, and his admission that, while payment records exist, he has not sought them.  More fundamentally, an element of conversion is that unauthorized control be exerted "knowingly or intentionally."  Ind. Code § 35-43-4-3.  Even assuming that Holt was not delinquent, there is no evidence that FMCC acted with the requisite mens rea.

### 2. Debt Collection Claims

In Counts VIII and X, Holt claims that FMCC committed fraud and violated the Fair Debt Collection Practices Act (FDCPA) when it tried to collect $6,000 in damages to a 1997 Ford Taurus that he had leased prior to the Expedition.  Holt alleges there was "no significant damage" to the vehicle when he turned it in.  (Compl. ¶ 77.)  He also alleges that FMCC violated the FDCPA by harassing him in the course of attempting to collect the $6,000 debt.  (*Id.* ¶ 79.)

Under the FDCPA, a debt collector may not use deceptive or certain coercive measures to collect a debt.  15 U.S.C. §§ 1692d-1692e.  However, the Court agrees with Defendants' assertions that they are "creditors," not "debt collectors," under the Act.  *Id.*; *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003).  In any event, Holt has not adduced any evidence that would demonstrate that Defendants harassed him or falsely represented the debt that he owed.

In his deposition, Holt testified that he had failed to conduct any discovery because he was more focused on his health problems and did not have the resources to obtain counsel.  [DE 77-34 at 4.]  While the Court is empathetic to Holt's health concerns, I simply cannot allow this case to proceed to trial in the absence of evidence that would allow a reasonable jury to support Holt's claims.

19

## III. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [DE 77, DE 81] are **GRANTED**.  Paul Heuring Ford's motions to strike [DE 88, DE 94] are **DENIED** as moot.  The Clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants, and shall treat this civil action as **TERMINATED**.  All further settings in this action are hereby **VACATED**.

**SO ORDERED**.

ENTERED: September 7, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT